gage. The defendant should therefore have judgment dismissing the complaint on the merits, with costs. The allegations of the complaint are not sufficient to attack the assignment, but it is not necessary to discuss this matter, as the facts proved do not warrant any judgment in favor of plaintiff, or any amendment to his complaint.

---

### GREEFF *et al. v.* DIECKERHOFF *et al.*

(*Common Pleas of New York City and County, General Term.* February 4, 1889.)

1. PLEDGE—RIGHT OF PLEDGEE TO REHYPOTHECATE SECURITY.

Plaintiff obtained permission to overdraw his account with his banker, M., to the amount of $20,000. At the same time he left with M. $3,000 worth of S. bonds, concerning which M. testified that he told plaintiff that when he wanted money he would have a right to borrow upon them. Certain P. bonds were also delivered to M., who said that they were of no use to him, because he could not borrow money upon them, and returned them. Afterwards, plaintiff, desiring an additional credit of $30,000, took the P. bonds to M., and asked him if he could do anything with them. M. did not have the money himself, and borrowed the amount required of other parties; and, with the knowledge and assent of the plaintiff, pledged the P. bonds as security for the loan. There was no evidence that the plaintiff ever forbade a similar use of the bonds in the future. Afterwards, M. objecting to carrying the $20,000 loan without collateral, the plaintiff delivered to him $7,000 worth of L. bonds, and M. testified that at this time he told plaintiff that, with all the bonds that had been thus delivered to him, he could raise about $50,000. Plaintiff denied this latter statement, and also that M. had said that he would have a right to borrow on the S. bonds. *Held,* that under the circumstances greater weight must be given to the testimony of M., and that he had the right to rehypothecate the securities intrusted to him by plaintiff.

2. NEGOTIABLE INSTRUMENTS—BONA FIDE HOLDERS.

Where defendants loaned money to M. on the strength of such securities, without notice on their part that he was not the owner, the mere fact that some three or four days elapsed after the loan was made before the securities came into their possession did not preclude them from claiming as *bona fide* holders.

Appeal from equity term.

Action by Emil Greeff and others against Emil Dieckerhoff and others, assignees of L. Christian Meyer, to redeem certain bonds belonging to the plaintiffs which Meyer had pledged to the defendants for a loan made to them. The plaintiffs' securities did not come into Meyer's possession, and were not delivered to defendants by him, until three or four days after the loan was made. None of the securities belonging to the plaintiffs were delivered to the defendants by Meyer until some time after defendants made the loan to Meyer.

The following opinion was delivered by BOOKSTAVER, J.:

"This is an action brought by the plaintiffs to enable them to redeem certain securities held by the defendants on a loan made by the latter to L. Christian Meyer, formerly a banker. The securities consist of three Milwaukee & St. Paul Railroad Company bonds of the par value of $1,000 each, and fifteen bonds of the Phœnix Manufacturing Company, of Paterson, N. J., of the par value of $1,000 each. They were all negotiable and passed by delivery. Meyer made a general assignment in July, 1884, and prior to his failure had delivered the bonds to the defendants as security for loans made by them to him. The case presents two questions for determination: *First,* did L. Christian Meyer have any right or authority to pledge or rehypothecate the bonds of the plaintiffs? and, *second,* did defendants loan their money upon the faith of the bonds in controversy, so as to become *bona fide* holders of them, as against the plaintiffs?

"As to the first question, it appears that L. Christian Meyer was a banker and broker from about 1864 to July, 1884. The plaintiffs were an importing and commission house. About the beginning of 1878 they opened a bankaccount with Meyer, the latter allowing interest on plaintiffs' surplus money deposited with him. In February, 1878, the plaintiffs were called upon to

make heavy advances to their consignors, and asked Meyer permission to overdraw their account, if necessary, to the amount of $20,000, to which Meyer assented. At the time the three Milwaukee & St. Paul bonds were left with Meyer, as Mr. Greeff says, in order that if the $20,000 was overdrawn a little Meyer might feel secure about it. He then gave plaintiffs a receipt for those bonds, in which he recited that he held them as 'collateral security against overdraft.' Mr. Meyer says that when he received them he told plaintiffs that whenever he had not sufficient money he would have a right to borrow upon them. This plaintiffs deny. In 1879, the plaintiffs, wishing to continue the right to overdraw to the extent of $20,000, asked Meyer to continue that privilege. He at that time said it was not convenient, and he did not care to do the business; but after two or three interviews agreed to do so, and then the Phœnix bonds were delivered to him. Mr. Meyer says that when they were given to him he told plaintiffs they were of no use to him, because he could not raise money on them, and this is not denied by plaintiffs. I think this fact significant, as tending to show that Meyer intended to use the bonds for the purpose of borrowing money upon them, and that plaintiffs knew, or had good reason to suppose, that he would so use them, especially when taken in connection with the fact that these bonds were subsequently returned to the plaintiffs, although the right to overdraw was continued without any other security than the three Milwaukee & St. Paul bonds, which he could use for the purpose of borrowing money. In 1882, plaintiffs desired an additional extension of credit to the amount of $30,000, making a right to overdraw, in all, to the amount of $50,000. They then brought 45 of the Phœnix bonds to Meyer, and asked him whether he could do anything with those bonds, to which Meyer replied that he would try. Plaintiffs admit that at that time he said he had loaned out all his money, and that he could not loan them $30,000 more, and he would have to look around to see whether some friends would loan him the money. Within a few days Meyer reported that he could place their loan at 90 days at 6 per cent., but that they would have to pay one-quarter of one per cent. commission on the transaction; and this was assented to by plaintiffs. It is also shown by the receipt dated June 17, 1882, which, in addition, shows that the loan was to be continued on call, after five days' notice. No notice to close the loan was ever given. This transaction clearly shows that Meyer had then placed these bonds, and that plaintiffs knew it, and assented to and ratified such use of the bonds. Now, the plaintiffs do not testify, and there is no evidence to show, that Meyer was ever forbidden by plaintiffs to make a similar use of the bonds in the future. If they did not wish such use made of their property, I think it was their duty to have so informed Meyer, and to have taken some measures to have prevented it. Plaintiffs claim that this loan was subsequently paid; but I do not think the evidence justifies such a contention. It is true Mr. Emil Greeff testifies that in September, 1882, when it became due, this loan was paid off; but the accounts in evidence do not sustain him, for long after that time these accounts show that plaintiffs were still credited with $50,000 over and above their deposits, and interest was regularly charged upon the whole amount. No check was ever drawn, as far as plaintiffs show, in payment of this loan, nor was any deduction made for its payment upon the accounts. Mr. Meyer's version of that transaction is that when the ninety days were about expiring he said to Mr. Greeff: 'Your loan expires now. You have plenty of money to your credit. Do you wish to pay it off?' Mr. Greeff replied: 'I would rather let the loan stand, or have the money to my credit. The time may come when I will want money, and I want to be easy,—to know that I can always get money.' Mr. Emil Greeff says Mr. Meyer asked him at the time whether he wanted the securities back, and he said: 'No, Mr. Meyer. All I want is to have the privilege, at any time, to draw up to $50,000. Keep the bonds, and let us go on the same way,

with an account current.' From these facts I have no hesitation in arriving at the conclusion that the loan was not paid off at the time plaintiffs claim it was. But the plaintiffs knew that the Phœnix bonds had been pledged by Meyer to some one for a loan of $30,000. That loan was made by Hagemeyer & Brunn. At the time of Meyer's assignment only $10,000 upon it had been repaid them, and they held thirty of the Phœnix bonds as security for the balance of the loan. The right of Meyer to pledge these bonds to Hagemeyer & Brunn was recognized by plaintiffs, after Meyer's assignment, by their redeeming these bonds and satisfying the unpaid balance of $20,000 due upon that loan. When Meyer paid the $10,000 on account of that loan he received from Hagemeyer & Brunn fifteen of the Phœnix bonds, which he subsequently pledged and repledged as his necessities required. Mr. Meyer says that in December, 1883, or January, 1884, he again called plaintiff's attention to the credit of $50,000, and said to him: 'Mr. Greeff, you have all this money to your credit. It is inconvenient for me to continue the loan of $20,000, for which I have no collateral. If I give you a loan, I must always be prepared when you want the money, and I would rather cancel it, because that will make me easy. I can use my money to better advantage.' That Mr. Greeff did not wish to have it canceled, and shortly after brought the seven Long Island City and Flushing bonds, and said he wished the loan of $20,000 to remain, and that these bonds would be additional security; to which he replied: 'If you wish them, I have $45,000 Phœnix, $7,000 Long Island, and $3,000 Milwaukee, and that will enable me to raise about $50,000.' Mr. Greeff denies this; but the reason he gives for leaving these Long Island bonds with Meyer at that time I think wholly inadequate. He says he wanted to make Mr. Meyer feel entirely sure about loaning them the money. Now, before that time, he knew the forty-five Phœnix bonds had been pledged for the loan of $30,000, and it nowhere appears that he knew, or had reason to suppose, that loan had been paid. The $3,000 Milwaukee & St. Paul bonds and the Long Island bonds were wholly inadequate as a security for the loan of $20,000. I think, in view of these facts, greater weight should be given to the testimony of Mr. Meyer, and that the seven Long Island bonds were given to him to be used as he testifies. A number of other circumstances appearing in the testimony might be referred to in support of defendant's view of this question; but I think I have stated enough to justify me in the conclusion to which I have arrived, which is that Meyer had the right to rehypothecate the securities.

"As to the second question, the testimony offered by defendants is uncontradicted that each of the loans made by them to Meyer was made on the faith of collateral securities, either given at the time of the loan, or to be given within a short time thereafter, and in no instance on a credit to Meyer merely. Were one to borrow money on a proviso to secure the loan by a real-estate mortgage, I apprehend a court of equity would regard such a promise as creating a lien on any real estate which the borrower might have, and enforce it accordingly. So, in this case, the defendants had the right to demand, and it was Meyer's duty to give, the securities promised; and, when he did actually give them, I think the defendants are in the same position they would have been if the securities had been given at the very time the seven checks were handed Meyer. He and Mr. Triacca satisfactorily explain the lapse of time between the delivery of the checks for the loans to Meyer and the sending of the securities by him; and the mere lapse of time, under the circumstances, would not convert the loans into debts without security, so that the subsequent giving of the bonds would be the giving of securities for an antecedent debt, as claimed by the plaintiffs, nor would it cut off the title of the pledgees. They were not given to pacify a clamorous creditor, but in pursuance of a pre-arranged agreement. Besides, in most instances, the very securities to be given were designated by Mr. Meyer at the time he received the checks. In one instance 100 shares of the Chicago & Northwestern stock were with-

drawn, and the Phœnix bonds substituted, by agreement between defendants and Meyer. I do not think that this in any way changes the transaction. It was merely substituting one security for another, without impairing the nature of the loan or its security. There is no claim made by plaintiffs that defendants knew or had any reason to believe, or even to suspect, that the securities did not belong to Meyer. I am therefore of opinion that the defendants are *bona fide* owners of the securities in question, for value. As the amount of the loan made by defendants to Meyer is greater than the value of all of plaintiffs' securities, the complaint should be dismissed, with costs."

*Larned & Warren,* for appellants.   *Blumenstiel & Hirsch,* for respondents.

PER CURIAM.   The judgment appealed from should be affirmed, upon the opinion of BOOKSTAVER, J., at equity term.

---

### PEOPLE *v.* EQUITABLE GAS-LIGHT CO.
### SAME *v.* CONSOLIDATED GAS-LIGHT CO.

#### (*Court of General Sessions, New York County.*   May, 1888.)

1. GRAND JURY—POWERS AND DUTIES—CRIMES OF CORPORATIONS.
   Code Crim. Proc. N. Y. § 252, declaring that the grand jury has the power, and it is their duty to inquire into all crimes, and to present them to the court, applies to crimes of corporations as well as of individuals, and is not affected by sections 675, 682, regulating criminal proceedings against corporations.

2. INDICTMENT—SETTING ASIDE—APPEARANCE.
   Code Crim. Proc. N. Y. §§ 296–299, provide for arraignment of a prisoner; for personal appearance in case of felony, otherwise either in person or by attorney.  Sections 313, 315, specify grounds for setting aside an indictment, and require the motion to set aside to be heard at the time of arraignment, unless for good cause the court postpone the hearing to another time.  *Held,* that a motion to set aside the indictment cannot be heard, where there is no appearance except for the purpose of the motion.

3. SAME—CORPORATIONS.
   A motion to set aside an indictment against a corporation on the ground that the proceedings provided in Code Crim. Proc. §§ 675–682, were not resorted to, and that appearance to answer to the indictment could not be compelled, must be denied, as these are not among the grounds specified in section 313 for setting aside an indictment.

4. CORPORATIONS—INDICTMENT—APPEARANCE.
   Under the laws of New York, a corporation cannot by any means be compelled to appear and submit to the jurisdiction of a court wherein an indictment against the corporation has been filed.

Defendants were separately indicted for violating Laws N. Y. 1886, c. 300, "An act to protect oyster-beds," and move to set aside the indictment.

*Frederick R. Coudert,* for motion.   *John R. Fellows,* for the State.

SMYTH, Recorder.   Code Crim. Proc. § 296, provides that when an indictment is filed, the defendant must be arraigned thereon before the court in which it is found, or before the court to which it is sent or removed.  If the indictment be for a felony, the defendant must be personally present when arraigned; but if for a misdemeanor only, his personal appearance is unnecessary, and he may appear upon the arraignment by counsel.  Section 297. When his personal appearance is necessary, if he be in custody, the court may direct him to be brought before it by the officer in whose custody he is, to be arraigned; and should he be discharged on bail, and do not appear for arraignment, his bail may be forfeited, and a bench warrant issue for his arrest. Sections 298, 299.   Upon the defendant's appearing for arraignment, he is to be informed of his right to the aid of counsel, if he has none, and the court must assign him counsel if he desire it; and if he demand it the indictment must be read to him, or a copy thereof furnished, before requiring him to plead; and time must be allowed him, if he requires it, to answer the in-